[No. C000070. Third Dist., May 13, 1987.]

COUNTY OF EL DORADO et al., Plaintiffs and Respondents, v. ROBERT HENRY SCHNEIDER, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to rule 976.1 of the California Rules of Court, all portions of this opinion shall be published except parts I through VIII of the Discussion.

**COUNSEL**

Robert H. Schneider, in pro. per., and David G. Lee for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Joel Carey, J. Robert Jibson and Cynthia G. Besemer, Deputy Attorneys General, for Plaintiffs and Respondents.

William A. Richmond, District Attorney (Tulare), Gary H. Evans and John S. Higgins, Deputy District Attorneys, as Amici Curiae on behalf of Plaintiffs and Respondents.

**OPINION**

SIMS, J.—Evidence Code section 892 is a part of the Uniform Act on Blood Tests to Determine Paternity. (Evid. Code, § 890; all further nondescript statutory references are to the Evidence Code.) Section 892 allows a trial

court to order a person to submit to blood tests in a civil action in which paternity is at issue, and, upon refusal, to resolve the question of paternity adversely to the person who refused.[1] In this case involving an action to establish paternity for purposes of child support, we hold that the constitutional rights of a father who refused to submit to an order for blood tests were not violated when the trial court invoked section 892 and resolved the question of paternity against him.

## FACTS AND PROCEDURAL BACKGROUND

On January 5, 1984, plaintiffs County of El Dorado and Angelina M., a minor, by her guardian ad litem, Alberta P. B. (hereafter collectively County), filed a complaint against defendant Robert Henry Schneider to establish paternity of Angelina M., to obtain child support payments, and to obtain reimbursement for public assistance paid by County. (See Civ. Code, § 248; Welf. & Inst. Code, § 11350; *County of Yolo v. Francis* (1986) 179 Cal.App.3d 647 [224 Cal.Rptr. 585].) Defendant, represented by counsel, thereafter filed an answer in which he denied paternity.

County then noticed a motion for an order requiring defendant, the mother and the child to submit to a variety of blood tests, including extended red cell, human leukocyte antigen (HLA) white cell, and electrophoresis analysis. The motion was supported by an affidavit of a county investigator who reported that the child's mother had stated in county records that defendant was the child's father.

Unhappy with the representation of his retained counsel, defendant then substituted himself in propria persona as attorney of record.[2]

Defendant failed to appear at the hearing on the motion for blood tests, and the trial court entered an order requiring defendant to take the tests.

---

[1]Section 892 provides: "In a civil action in which paternity is a relevant fact, the court may upon its own initiative or upon suggestion made by or on behalf of any person whose blood is involved, and shall upon motion of any party to the action made at a time so as not to delay the proceedings unduly, order the mother, child, and alleged father to submit to blood tests. *If any party refuses to submit to such tests, the court may resolve the question of paternity against such party or enforce its order if the rights of others and the interests of justice so require.* Any party's refusal to submit to such tests shall be admissible in evidence in any proceeding to determine paternity." (Italics added.)

[2]Defendant makes no claim he was denied counsel in the trial court. Indeed, at the hearing on the motion to establish paternity the trial court advised defendant at length of his right to counsel at public expense in the event of his indigency and defendant stated he wished to represent himself. He also did so initially on appeal; however, he is currently represented in this court by retained counsel.

Defendant does not dispute he received the order; however, he failed to appear for the test at the specified time and place.

County then noticed a motion to establish paternity pursuant to section 892. On the date of the hearing on the motion, May 31, 1984, defendant filed a document entitled "JUDICIAL NOTICE Re: Want of JURISDICTION." In the document defendant argued at length that the court had no jurisdiction over him. Defendant asserted the state had no interest in regulating his person outside of the substantive criminal law. Defendant argued that, in the absence of a contract between the state and him, the police power of the state could be exercised over him with respect to noncriminal conduct only with his consent.[3] He also alleged that application of section 892 would deny him rights under the First, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth, Thirteenth, and Fourteenth Amendments.

Defendant also appeared at the hearing on County's motion to establish paternity. He again asserted to the court that County had no jurisdiction to proceed with the action in the absence of a contract with him. The trial court asked defendant why he did not appear for the blood tests. Defendant's only reply was that ". . . I didn't comply to the warrant for a blood test under the First Amendment of the Constitution, under freedom of religion, so I didn't appear on the warrant for a blood test." Defendant has *never* indicated orally or in writing what religion he practices nor how the blood tests would have conflicted with his religious beliefs.

The trial court ruled defendant was subject to its in personam jurisdiction because he had been served with the summons and complaint and had filed an answer. The court concluded County was authorized to bring the action by Welfare and Institutions Code section 11350. Having determined that section 892 authorized it to resolve the paternity issue adversely to defendant due to his failure to take the blood tests, the court ruled that paternity was established as a matter of law and entered an order declaring defendant to be the father of the child.

Thereafter, a court trial was held on the amount of child support and arrearages. Although defendant was notified of the trial, he did not appear. A judgment awarding child support and arrearages was filed, and defendant timely filed notice of appeal.

---

[3]Thus, for example, defendant's memorandum argued, "The State did NOT create me, the individual natural born citizen of this State—the great CREATOR did as opposed to the State —unlike a corporation which is state created. The State (and its creatures: USA/municipalities as agents thereof) have No interest in my PERSON outside the substantive criminal law in the CRIMINAL CODE."

In this court, defendant has abandoned many of his arguments made to the trial court, including his principal assertion that County could not rely upon the police power in the absence of a contract with him.[4] Defendant now contends the trial court erred in declaring him the child's father because: (1) the district attorney was not empowered to bring this action; (2) defendant appeared specially for the purpose of challenging the trial court's jurisdiction and never made a general appearance; (3) section 892 did not authorize the trial court to resolve the question of paternity against him; (4) his religious beliefs precluded his submitting to a paternity blood test; (5) he was denied his constitutional rights to a jury trial on the paternity issue; (6) the order establishing paternity denied defendant his constitutional rights to due process of law, including his right to confront and cross-examine his accusers; and (7) the trial court erroneously relied on its order establishing paternity in issuing its order for child support and arrearages because (a) plaintiff's at-issue memorandum and certificate of readiness was filed when the trial court had no jurisdiction because plaintiff had appealed from a nonappealable order; (b) the order of paternity was void for reasons previously asserted and because affidavits used to obtain the order were not in proper form and contained hearsay; and (c) defendant was wrongfully denied a hearing on his motion to set aside the order establishing paternity.

In this published portion of our opinion, we reject defendant's constitutional claims. In an unpublished portion of the opinion, we conclude defendant's remaining contentions of error are unfounded. We shall therefore affirm the judgment.

DISCUSSION

I-VIII*

. . . . . . . . . . . . . . . . . . .

IX

*Application of section 892 to determine paternity did not violate defendant's rights under the federal Constitution.*

Defendant contends application of section 892 to determine paternity denied him various rights granted by the federal Constitution. We disagree.

---

[4] "It is clearly within the power of the state to provide for the enforcement of the parental duty to support one's children." (*Salas* v. *Cortez* (1979) 24 Cal.3d 22, 32 [154 Cal.Rptr. 529, 593 P.2d 226]; cert. den. 444 U.S. 900 [62 L.Ed.2d 136, 100 S.Ct. 209].)

*See footnote, *ante,* page 1263.

A. *Defendant made no showing that his First Amendment rights were violated.*

 Defendant contends application of section 892 violated his First Amendment right to practice his religion. However, "One who attacks a statute upon [a constitutional] ground has the burden of showing that his rights have been invaded by the actual or threatened application of the challenged law to him." (*Brock* v. *Superior Court* (1939) 12 Cal.2d 605, 613-614 [86 P.2d 805].) Defendant has never shown how the order for blood tests would interfere with his religion. (Cf. *Thomas* v. *Review Bd., Ind. Empl. Sec. Div.* (1981) 450 U.S. 707, 710-711 [67 L.Ed.2d 624, 629, 101 S.Ct. 1425]; see also *Bowen* v. *Roy* (1986) 476 U.S. 693 [90 L.Ed.2d 735, 106 S.Ct. 2147].) Consequently, in the absence of such a showing, we must presume the statute was constitutionally applied to defendant.

B. *The federal Constitution does not require a jury trial.*

 Defendant contends he was wrongfully denied a jury trial. However we conclude the federal Constitution provided no right to a trial by jury.

1. *Sixth Amendment*

The Sixth Amendment to the federal Constitution[6] guarantees a jury trial in "criminal prosecutions" of serious offenses and is made applicable to the states by the Fourteenth Amendment. (*Duncan* v. *Louisiana* (1968) 391 U.S. 145 [20 L.Ed.2d 491, 88 S.Ct. 1444].) The United States Supreme Court has construed the Sixth Amendment to require a jury only where a defendant is subject to a penal sanction in the action. (See *Kennedy* v. *Mendoza-Martinez* (1963) 372 U.S. 144, 166 [9 L.Ed.2d 644, 659-660, 83 S.Ct. 554].) Moreover, with the possible exception of *Mendoza-Martinez,* where loss of citizenship was at issue, the Supreme Court has interpreted the Sixth Amendment to require a jury trial only where the defendant faces a possible term of imprisonment of more than six months. (*Baldwin* v. *New York* (1970) 399 U.S. 66, 68-69 [26 L.Ed.2d 437, 440, 90 S.Ct. 1886] [plur. opn. of White, J., Brennan, J., and Marshall, J.]; see *Muniz* v. *Hoffman* (1975) 422 U.S. 454, 477 [45 L.Ed.2d 319, 335-336, 95 S.Ct. 2158]; *Dyke* v. *Taylor Implement Mfg. Co.* (1968) 391 U.S. 216, 219 [20 L.Ed.2d 538, 542, 88 S.Ct. 1472]; *Cheff* v. *Schnackenberg* (1966) 384 U.S. 373, 378-379 [16 L.Ed.2d 629, 633, 86 S.Ct. 1523].)

---

[6]The Sixth Amendment states in part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, . . ."

In *County of Los Angeles* v. *Soto* (1984) 35 Cal.3d 483 [198 Cal.Rptr. 779, 674 P.2d 750], our Supreme Court held that a defendant stipulating to a judgment of paternity must understand the consequences of the stipulation and ensuing judgment and be aware of his right to a hearing at which the county is required to prove paternity and at which the defendant may present a defense with the assistance of counsel. (P. 490.) The court found, "The grave consequences attendant upon an adjudication of paternity are analogous to those flowing from a judgment of conviction of a criminal offense." (P. 489.) These consequences include possible disruption of existing families and damage to reputations; the deprivation of property and, potentially, liberty; the obligation to educate and support a child; and enforcement of the obligation through garnishment, contempt, and interstate assistance statutes. (P. 488; see also *Salas* v. *Cortez* (1979) 24 Cal.3d 22 [154 Cal.Rptr. 529, 593 P.2d 226] [right to appointed counsel in a paternity action].)

Nonetheless, although the *Soto* court found paternity procedures "analogous" to criminal proceedings it did not find them in all respects equivalent nor did *Soto* suggest a trial by jury was constitutionally required. In fact, there are significant differences between criminal proceedings and those for paternal support of children.

Unlike a criminal action, the purpose of a paternity action is not to punish the defendant. (See *INS* v. *Lopez-Mendoza* (1984) 468 U.S. 1032 [82 L.Ed.2d 778, 104 S.Ct. 3479] [deportation proceedings not criminal because not intended to punish past conduct]; cf. *Kennedy* v. *Mendoza-Martinez, supra,* 372 U.S. 144 [forfeiture of citizenship held penal sanction].) Rather, the purpose is to secure support for the child and to relieve the public of the burden of support. (*In re Marriage of Shore* (1977) 71 Cal.App.3d 290, 298 [139 Cal.Rptr. 349]; *McLain* v. *Meadows* (1919) 44 Cal.App. 402, 403 [186 P. 411].) Defendant is not subject to any penal sanction in the present action; the only direct consequence of an adjudication of paternity is an obligation to pay money.

It is true that if a defendant fails to comply with a support order, and if that defendant is criminally prosecuted for willful nonsupport (Pen. Code, § 270), the civil adjudication of paternity would be admissible as evidence in the criminal action. (Pen. Code, § 270e.) But that downstream consequence is not sufficient to convert this action into a criminal action. The defendant would be entitled to a jury trial in the criminal action. A prior adjudication of paternity would not allow a trial court to withhold the question of paternity from the jury. (*Patterson* v. *Municipal Court* (1965) 232 Cal.App.2d 289 [42 Cal.Rptr. 769].) The adjudication of paternity would not be given res judicata or collateral estoppel effect, because a higher burden of proof applies in the criminal action.[7] (*Salas* v. *Cortez, supra,* 24 Cal.3d

---

[7]The burden of proof in a paternity action is by a preponderance of the evidence even where the action is brought by the county for the benefit of a public entity. (*Huntingdon* v. *Crowley*

at p. 29, fn. 5; *Patterson* v. *Municipal Court, supra,* 232 Cal.App.2d at p. 302.) Therefore, an adjudication of paternity in the present action is not the functional equivalent of such an adjudication in any subsequent criminal action.

Nor is the present action made criminal in nature by California's provision of certain procedural rights, such as right to counsel. California's "decision . . . to provide some of the safeguards applicable in criminal trials cannot itself turn these proceedings into criminal prosecutions requiring the full panoply of rights applicable there. [Citation.]" (*Allen* v. *Illinois* (1986) 478 U.S. 364, 372 [92 L.Ed.2d 296, 306, 106 S.Ct. 2988].)

Modern cases from other jurisdictions have uniformly concluded paternity actions are essentially civil in character, where no direct penal consequences attach to a finding of paternity. (See, e.g., *Oliveira* v. *Santosuosso* (1967) 102 R.I. 362 [230 A.2d 864]; *State* v. *Volz* (1951) 156 Ohio St. 60 [100 N.E.2d 203, 210, 45 Ohio Ops. 63]; *Riddle* v. *Anderson* (1974) 227 Pa.Super 68 [323 A.2d 115, 119]; Krause, Illegitimacy: Law and Social Policy (1971) pp. 109-111.) We agree with these authorities and conclude that, for purposes of the Sixth Amendment guarantee of a jury trial, the present paternity action is civil, not criminal. Consequently, the Sixth Amendment does not require a jury trial. (See *Shillitani* v. *United States* (1966) 384 U.S. 364, 371 [16 L.Ed.2d 622, 627, 86 S.Ct. 1531]; *United States* v. *Schellong* (7th Cir. 1983) 717 F.2d 329, 366, cert. den. (1984) 465 U.S. 1007 [79 L.Ed.2d 234, 104 S.Ct. 1002].)

### 2. *Seventh Amendment*

The Seventh Amendment to the federal Constitution provides in pertinent part, "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, . . ."

The Seventh Amendment jury trial guarantee has not been incorporated in the due process clause of the Fourteenth Amendment and is not binding on the states. (*Palko* v. *Connecticut* (1937) 302 U.S. 319, 324 [82 L.Ed. 288, 291, 58 S.Ct. 149]; *Walker* v. *Sauvinet* (1876) 92 U.S. 90, 92-93 [23 L.Ed. 678, 679]; *Dorsey* v. *Barba* (1952) 38 Cal.2d 350, 357 [240 P.2d 604]; *Lavine* v. *Hospital of the Good Samaritan* (1985) 169 Cal.App.3d 1019, 1028 [215 Cal.Rptr. 708].) So far as the Seventh Amendment is concerned, "The States . . . are left to regulate trials in their own courts in their own way." (*Walker* v. *Sauvinet, supra,* 92 U.S. at pp. 92-93 [23 L.Ed.2d at p. 679].) Conse-

---

(1966) 64 Cal.2d 647, 651 [51 Cal.Rptr. 254, 414 P.2d 382]; ; *Walsh* v. *Palma* (1984) 154 Cal.App.3d 290, 295 [201 Cal.Rptr. 142].)

quently, in this state court action, defendant has no right to a jury trial under the Seventh Amendment.

### 3. *Fourteenth Amendment*

The due process clause of the Fourteenth Amendment to the federal Constitution provides, ". . . nor shall any State deprive any person of life, liberty, or property, without due process of law; . . ."

To our knowledge, the United States Supreme Court has never relied on the Fourteenth Amendment's due process clause, in and of itself, to impose a jury trial requirement on the states; rather, the high court has held the states must supply juries only to the extent they are required under the Sixth Amendment. (See *Mathews* v. *Eldridge* (1976) 424 U.S. 319 [47 L.Ed.2d 18, 96 S.Ct. 893]; *Palko* v. *Connecticut, supra,* 302 U.S. at pp. 324-325 [82 L.Ed.2d at pp. 291-292]; *Letendre* v. *Fugate* (4th Cir. 1983) 701 F.2d 1093, 1094, cert. den. 464 U.S. 837 [78 L.Ed.2d 122, 104 S.Ct. 125]; *United States* ex rel. *Griffin* v. *Martin* (2d Cir. 1969) 409 F.2d 1300, 1302; see also *Lavine* v. *Hospital of the Good Samaritan, supra,* 169 Cal.App.3d at p. 1028; Tribe, American Constititional Law (1978) § 10-15, pp. 550-554.) Since, as we have seen, a jury trial was not required by the Sixth Amendment, it was not required by the Fourteenth.

### C. *The determination of paternity did not violate federal due process.*

The federal due process clause ordinarily guarantees an evidentiary hearing to a defendant in a paternity action. (*Little* v. *Streater* (1981) 452 U.S. 1, 5 [68 L.Ed.2d 627, 632, 101 S.Ct. 2202]; *County of Ventura* v. *Castro* (1979) 93 Cal.App.3d 462, 468-469 [156 Cal.Rptr. 66], approved in *County of Los Angeles* v. *Soto, supra,* 35 Cal.3d at pp. 485-486; see *Isbell* v. *County of Sonoma* (1978) 21 Cal.3d 61, 66 [145 Cal.Rptr. 368, 577 P.2d 188], cert. den. 439 U.S. 996 [58 L.Ed.2d 669, 99 S.Ct. 597].) Defendant contends the application of section 892 to establish paternity wrongfully denied him his right to a hearing where he could confront and cross-examine witnesses against him.

We think defendant's contention is properly analyzed by viewing section 892 as a discovery statute: it establishes procedures by which information can be obtained in a civil action and it provides sanctions for refusal to supply the information. (See fn. 1, *ante.*)[8] For this purpose, as with the ques-

---

[8]Defendant had no right to refuse the court ordered blood test on the ground it would violate his right against self-incrimination (*Schmerber* v. *California* (1966) 384 U.S. 757, 760-765 [16 L.Ed.2d 908, 914-916, 86 S.Ct. 1826]) or his right to privacy. (*Shults* v. *Superior Court* (1980) 113 Cal.App.3d 696, 699-700 [170 Cal.Rptr. 297]; see also *People* v. *Bynon* (1956) 146 Cal.App.2d 7 [303 P.2d 75].)

tion of entitlement to a jury trial, we believe the present paternity action is civil, not criminal in character. Indeed, various provisions of California's Civil Discovery Act (i.e., Code Civ. Proc., §§ 2019, 2020, 2034) have been held applicable (and we think properly so) to an action brought to establish paternity and support pursuant to Welfare and Institutions Code section 11350. (*Gonzales* v. *Superior Court* (1980) 117 Cal.App.3d 57 [178 Cal.Rptr. 358] [defendants would be made to answer interrogatories provided use immunity was granted by protective order]; see also *Reynolds* v. *Reynolds* (1978) 86 Cal.App.3d 732, 735 [150 Cal.Rptr. 423] [revised Uniform Reciprocal Enforcement of Support Act held civil in character]; *Smith* v. *Smith* (1954) 125 Cal.App.2d 154, 167 [270 P.2d 613] [same].) The sanction at issue here—the order establishing paternity—is similar to sanctions provided by section 2034, subdivision (b)(2)(A) of our Code of Civil Procedure[9] and by rule 37(b)(2)(A) of the Federal Rules of Civil Procedure (28 U.S.C.).[10] (All further nondescript references to rules are to the Federal Rules of Civil Procedure.)

It is well established that the federal due process clause imposes limitations on the power of courts, even in aid of their own valid processes, to order discovery sanctions that deprive a party of his opportunity for a hearing on the merits of his claim. (*Societe Internationale* v. *Rogers* (1958) 357 U.S. 197, 209 [2 L.Ed.2d 1255, 1265, 78 S.Ct. 108]; see also *National Hockey League* v. *Met. Hockey Club, Inc.* (1976) 427 U.S. 639, 640 [49 L.Ed.2d 747, 749-750, 98 S.Ct. 2778] (*per curiam*).)

In *Insurance Corp.* v. *Compagnie Des Bauxites* (1982) 456 U.S. 694 [72 L.Ed.2d 492, 102 S.Ct. 2099], the Supreme Court recently addressed the question whether the trial court had constitutionally applied rule 37(b)(2)(A) when the trial court used the rule to establish that certain defendants, who had failed to comply with orders for production of documents, were subject to the court's in personam jurisdiction. (*Id.,* at p. 699 [72 L.Ed.2d at p. 199].) Because of the close similarity of the rule 37(b)(2)(A) sanction to that involved here, we think *Bauxites* controls our federal due process analysis. There, the court discussed the historical due process underpinnings of the rule as follows: "Rule 37(b)(2)(A) itself embodies the standard established

---

[9]Code of Civil Procedure section 2034, subdivision (b)(2)(A), provides in relevant part that upon a refusal of a party to obey an order for discovery, the court may order that "... the ... blood condition of the person sought to be examined, or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order." (See *Puritan Insurance Co.* v. *Superior Court* (1985) 171 Cal.App.3d 877 [217 Cal.Rptr. 602].)

[10]Rule 37(b)(2)(A) of the Federal Rules Civil Procedure provides that upon the failure of a party to obey a discovery order, the court may enter, "An order that the matters regarding which the order was made at any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order; ..."

in *Hammond Packing Co.* v. *Arkansas,* 212 U.S. 322 [53 L.Ed. 530, 29 S.Ct. 370] (1909), for the due process limits on such rules. There the Court held that it did not violate due process for a state court to strike the answer and render a default judgment against a defendant who failed to comply with a pretrial discovery order. Such a rule was permissible as an expression of 'the undoubted right of the lawmaking power to create a presumption of fact as to the bad faith and untruth of an answer begotten from the suppression or failure to produce the proof ordered . . . . [T]he preservation of due process was secured by the presumption that the refusal to produce evidence material to the administration of due process was but an admission of the want of merit in the asserted defense.' *Id.,* at 350-351 [53 L.Ed. 530, 29 S.Ct. 370].

"The situation in *Hammond* was specifically distinguished from that in *Hovey* v. *Elliott,* 167 U.S. 409 [42 L.Ed. 215, 17 S.Ct. 841] (1897), in which the Court held that it did violate due process for a court to take similar action as 'punishment' for failure to obey an order to pay into the registry of the court a certain sum of money. Due process is violated only if the behavior of the defendant will not support the *Hammond Packing* presumption. A proper application of Rule 37(b)(2) will, as a matter of law, support such a presumption. See *Societe Internationale* v. *Rogers,* 357 U.S. 197, 209-213, [2 L.Ed.2d 1255, 78 S.Ct. 1087] (1958). If there is no abuse of discretion in the application of the Rule 37 sanction, as we find to be the case here . . ., then the sanction is nothing more than the invocation of a legal presumption, or what is the same thing, the finding of a constructive waiver." (*Insurance Corp.* v. *Compaigne Des Bauxites, supra,* 456 U.S. at p. 705-706, fn. omitted [72 L.Ed.2d at p. 503].)

The *Bauxites* court promulgated two requirements for determining whether a rule 37(b)(2) sanction comports with due process: "First, any sanction must be 'just'; second, the sanction must be specifically related to the particular 'claim' which was at issue in the order to provide discovery. While the latter requirement reflects the rule of *Hammond Packing, supra,* the former represents the general due process restrictions on the court's discretion." (*Id.,* at p. 707 [72 L.Ed.2d at p. 504].)

We have no doubt that *Bauxites'* second requirement (the rule of *Hammond Packing* that defendant's refusal to take the blood test supports a presumption his denial of paternity lacks merit) is satisfied here. In *Bauxites,* the court found the presumption justified because the failure of defendants to produce documents made it impossible for the plaintiff to establish the full extent of defendant's contacts with the forum state, "the critical issue in proving personal jurisdiction." (*Bauxites, supra,* 456 U.S. at p. 709 [72 L.Ed.2d at p. 505].)

Here, the blood tests ordered by the court were equally critical to the County's case. It goes without saying that the act necessarily preceding parentage is procreation. That act, in turn, is invariably private. Witnesses are, to put it mildly, scarce. Blood tests therefore play a crucial role in the accurate determination of paternity. (See generally *Little* v. *Streater, supra,* 452 U.S. at p. 14 [68 L.Ed.2d at p. 637].)

■ Defendant asserts blood tests may be used only to exclude potential fathers and may not be used inclusively, i.e., as affirmative evidence to prove the likelihood of his paternity. Defendant essentially argues that since the permissible probative use of blood test evidence is minimal, his refusal to take the blood tests will not support a presumption his denial of paternity is nonmeritorious. However, we cannot agree with the premise of the argument.

Section 895, a part of the Uniform Act on Blood Tests to Determine Paternity, provides: "If the court finds that the conclusions of all the experts, as disclosed by the evidence based upon the tests, are that the alleged father is not the father of the child, the question of paternity shall be resolved accordingly. If the experts disagree in their findings or conclusions, or *if the tests show the probability of the alleged father's paternity, the question, subject to the provisions of Section 352, shall be submitted upon all the evidence, including evidence based upon the tests.*" (Italics added.)

Since section 895 authorizes submission of the question of paternity "upon all the evidence, including evidence based upon the tests," and since the tests are expressly characterized as those that demonstrate "the probability of the alleged father's paternity," section 895 plainly gives the trial court discretion (subject to § 352) to admit blood test analysis in evidence to prove the probability of the alleged father's paternity.[11]

---

[11]There are various methods for using information from blood analysis for the purpose of affirmatively showing that an alleged father is in fact the father of the child. (See generally Inclusion Probabilities in Parentage Testing (1983) Am. Assn. of Blood Banks, cited hereinafter as Inclusion Probabilities.) Most methods start by identifying and comparing various inherited characteristics of a child's blood with characteristics in the blood of the child's mother and the alleged father. (*Ibid.*) The characteristics are then usually compared statistically with the same characteristics in the general population of the same ethnic background. (*Ibid.*) However, there is more than one statistical theory used to convert this observed raw data into statements of the likelihood or probability of paternity. (Bias et al., *Theoretical Underpinning of Paternity Testing,* in Inclusion Probabilities, *op. cit. supra,* pp. 51, 56-59; Aickin & Kaye, Some *Mathematical and Legal Considerations in Using Serological Tests to Prove Paternity,* in Inclusion Probabilities, *op. cit. supra,* pp. 155, 160.) One of these methods of statistical analysis—the so-called Bayesian approach—has been citicized. (See, e.g., Peterson, *A Few Things You Should Know About Paternity Tests (But Were Afraid to Ask)* (1982) 22 Santa Clara L.Rev. 667.)

However, in this case we have no occasion to determine whether Bayesian analysis may be used under section 895. For our purposes, we need only conclude section 895 authorizes

By his wrongful refusal to take the test, defendant has deprived County and this court of any opportunity to evaluate the probative value of the blood test evidence. The probative value is therefore uncertain. "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." (*Bigelow* v. *RKO Radio Pictures* (1946) 327 U.S. 251, 265 [90 L.Ed. 652, 660, 66 S.Ct. 574]; *Highland Ranch* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 848, 863 [176 Cal.Rptr. 753, 633 P.2d 949].) We shall therefore assume the blood test evidence would have had potent probative value in showing defendant was the father of the child. We shall also consider that defendant offered a specious legal reason—denial of subject matter jurisdiction—to justify his refusal. (See, e.g., *Hammond Packing Co.* v. *Arkansas* (1909) 212 U.S. 322, 340 [53 L.Ed. 530, 540, 29 S.Ct. 370] [party resisting discovery erroneously asserted federal and state "rights"]; *Unger* v. *Los Angeles Transit Lines* (1960) 180 Cal.App.2d 172, 187-188 [4 Cal.Rptr. 370] [same]; *Shawmut Boston Intern. Banking Corp.* v. *Duque-Pena* (11th Cir. 1985) 767 F.2d 1504, 1507 [defendant "asserted unreliable grounds for the purpose of further delaying the suit"]; *Fletcher* v. *Southern Farm Bureau Life Ins. Co.* (8th Cir. 1985) 757 F.2d 953, 956 (*per curiam*) [plaintiff offered no valid reasons for refusal to attend medical examination].) We conclude the circumstances of defendant's refusal to take the blood tests satisfies the second requirement of *Bauxites,* i.e., defendant's refusal supports the presumption that the refusal was an admission of the want of merit in his asserted defense. (*Insurance Corp.* v. *Compagnie Des Bauxites, supra,* 456 U.S. at p. 709 [72 L.Ed.2d at p. 505].)

We next ask whether the trial court's sanction order was "just." (*Id.,* at p. 707 [72 L.Ed.2d at p. 504].) The question is not whether this court would have applied the sanction as an original matter; it is whether the trial court abused its discretion in so doing. (*Ibid.*)

The court in *Bauxites* relied on various factors in concluding the sanction was properly imposed. The court noted, for example, the claim on which discovery was sought was not frivolous, so that the attempt to pursue discovery to substantiate the claim was not a misuse of judicial process. Here, the substantiality of the claim is demonstrated by the mother's identification of defendant as the father of the child.

---

blood test evidence to be used affirmatively to show defendant's paternity; plainly the statute does that. Whether Bayesian analysis is an appropriate method is a question reserved for another day. (See *Everett* v. *Everett* (1984) 150 Cal.App.3d 1053, 1064-1068 [201 Cal.Rptr. 351], cert. den. 469 U.S. 849 [83 L.Ed.2d 102, 105 S.Ct. 166]; *County of Fresno* v. *Superior Court* (1979) 92 Cal.App.3d 133, 138 [154 Cal.Rptr. 660]; *Cramer* v. *Morrison* (1979) 88 Cal.App.3d 873, 883 [153 Cal.Rptr. 865]; *Dodd* v. *Henkel* (1978) 84 Cal.App.3d 604, 607-608 [148 Cal.Rptr. 780].)

The *Bauxites* court also relied on repeated warnings by the trial court to the effect that sanctions would be in order and upon the failure of defendants to keep promises of production of the documents in question. (*Id.,* at pp. 707-708 [72 L.Ed.2d at pp. 504-505].) Here, although *repeated* warnings were not given defendant, the sanction order is supported by other "just" considerations. One purpose of warnings is to make sure a recalcitrant party is aware of the consequences of failing to make discovery. Defendant was clearly put on notice by County in its moving papers and at the hearing of May 31 of the sanction at issue and the reason it was sought. (Cf. *Jones* v. *Otero* (1984) 156 Cal.App.3d 754 [203 Cal.Rptr. 90]; *In re Rubin* (9th Cir. 1985) 769 F.2d 611, 616.) Indeed, defendant's written memorandum in opposition to the motion to establish paternity makes clear he well knew in advance that the establishment of paternity was at issue at the hearing on sanctions. Defendant does not contend he was ignorant of the purpose of the hearing.[12] Although in some cases fairness would demand repeated warnings to a recalcitrant party, particularly where requested information is difficult to obtain, here the trial court could reasonably conclude repeated warnings would have been futile. Defendant made it clear to the trial court that his ideosyncratic theory of natural law precluded the assertion over him of any authority by County. Defendant has *never* indicated a willingness to take the blood tests. The trial court could reasonably conclude that further sparring with defendant over his specious claim of lack of jurisdiction would have accomplished nothing more than the unwarranted consumption of judicial resources.

In the circumstances shown here, the trial court properly exercised its discretion to establish paternity under section 892 and did not violate the federal due process clause in doing so. (*Insurance Corp.* v. *Compagnie Des Bauxites, supra,* 456 U.S. at p. 708 [72 L.Ed.2d at pp. 504-505].)

## X

*Application of section 892 did not violate defendant's rights under the state Constitution.*

Defendant contends the determination of paternity violated his rights under the state Constitution. However, for reasons that follow, we must disagree.

---

[12]Defendant contends *County of Los Angeles* v. *Soto, supra,* 35 Cal.3d 483 required him knowingly and voluntarily to waive jury trial. *Soto* is premised on the need to insure that a defendant understands that a confession of judgment will amount to a waiver of procedural rights. (P. 489.) Here, the record leaves no doubt that defendant understood the issue of paternity would be resolved against him if he refused the blood tests. *Soto's* concerns were therefore satisfied.

A. *A jury trial is not guaranteed by article I, section 16, the California Constitution.*

Article I, section 16, of the state Constitution provides in pertinent part that "Trial by jury is an inviolate right and shall be secured to all. . . ."

 Despite the broad language of the constitutional provision, " 'The right to trial by jury guaranteed by the Constitution is the right as it existed at common law at the time the Constitution was adopted. [Citation.] . . . The common law respecting trial by jury as it existed in 1850 is the rule of decision in this state. [Citation.] . . . It is the right to trial by jury as it existed at common law which is preserved; and what that right is, is a purely historical question, a fact which is to be ascertained like any other social, political or legal fact.' " (*People* v. *One 1941 Chevrolet Coupe* (1951) 37 Cal.2d 283, 286-287 [231 P.2d 832]; see *C & K Engineering Contractors* v. *Amber Steel Co.* (1978) 23 Cal.3d 1, 8-9 [151 Cal.Rptr. 323, 587 P.2d 1136].)

Many other states have constitutional provisions that also condition the right to jury trial upon its existence at common law. (See Annot., Right to Jury Trial in Bastardy Proceedings (1964) 94 A.L.R.2d 1128.) The courts of these states have uniformly resolved that since there was no duty to support a nonmarital child at common law, the issue of paternity was not tried to a jury, so that no right to a jury trial may be located in their state constitutions. (See, e.g., *State* ex rel. *Goodner* v. *Speed* (1982) 96 Wn.2d 838 [640 P.2d 13, 16] cert. den. 459 U.S. 863 [74 L.Ed.2d 119, 103 S.Ct. 140]; *Comish* v. *Smith* (1975) 97 Idaho 89 [540 P.2d 274, 277]; *People* ex rel. *Cizek* v. *Azzarello* (1980) 81 Ill.App.3d 1102 [401 N.E.2d 1177, 1181]; *Miller* v. *Russell* (Mo. App. 1979) 593 S.W.2d 598, 605; Annot., *op. cit. supra,* 94 A.L.R.2d at pp. 1130-1134, and authorities cited therein.)[13] We reach the same conclusion by a different route.

Under California law, "The common law at the time the Constitution was adopted includes not only the *lex non scripta* but also the written statutes enacted by Parliament. [Citation.]" (*People* v. *One 1941 Chevrolet Coupe, supra,* 37 Cal.2d at p. 287; *Moore* v. *Purse Seine Net.* (1941) 18 Cal.2d 835, 838 [118 P.2d 1], affd. *sub nom. C. J. Hendry Co.* v. *Moore* (1943) 318 U.S. 133 [87 L.Ed. 663, 63 S.Ct. 499].)

---

[13]In *DeSylva* v. *Ballentine* (1950) 96 Cal.App.2d 503 [158 Cal.Rptr. 132] the court asserted, without citation to authority, that at common law the father of an illegitimate child was under no obligation to provide for its support and education. (P. 513.) *DeSylva* was not addressing the constitutional right to jury trial and did not consider the statutes we discuss here. It does not affect our conclusion.

In 1576, Parliament enacted "An Act for Setting the Poor on Work" (hereafter Poor Law). (18 Eliz. I, ch. 3, § 2; see Krause, Illegitimacy: Law & Social Policy (1971) p. 105.)[14] The Poor Law allowed two Justices of the Peace, in their discretion, "upon the examination of the cause and circumstance," to charge the reputed father of a nonmarital child "with the payment of money weekly or other sustentation for the relief of such child. . . ." (*Id.*, at pp. 105-106.)

As relevant here, the Poor Law was amended by the Poor Law Amendment Act of 1844 (7 & 8 Vict. ch. 101, §§ 2-3) and by the Bastardy Act of 1845 (8 & 9 Vict. ch. 10, § 6). (See 2 Halsbury's Statutes of England (2d ed. 1948) pp. 466-478.) These amendments set forth procedures by which fathers were made to support nonmarital children in 1850. (See *Reg.* v. *Glynne* (1871) L.R. 7 Q.B. 16.) These affiliation proceedings were held to be civil, not criminal. (*Reg.* v. *Berry* (1859) 8 Cox. C.C. 121, 126.) The 1844 and 1845 enactments expressly provided that evidence as to paternity would be heard by Justices of the Peace sitting at Petty Session,[15] or, if an appeal were taken, by Justices of the Peace sitting in Quarter Session.[16] Although we have found

---

[14]See also *Salas* v. *Cortez, supra,* 24 Cal.3d at p. 32.

[15]"Throughout the thirteenth century local men of influence, laymen not lawyers, had been appointed as keepers of the peace (*custodes pacis*). Their duties, like those of coroners, were of an administrative and police nature. . . . Shortly before 1368 the title 'justice of the peace' finally replaced that of 'keeper.' The decline of the eyre and of other special judicial commissions contributed to the rise of the justices. An increase of power of a different kind arose indirectly out of the Black Death of 1394. This plague, which carried off a large part of the labouring population of England, raised an economic problem of some difficulty. There was a great shortage of labour and in consequence a demand for wages on a scale which seemed excessive to an employing class which was used to an ample supply of villeins. To meet the difficulty so-called 'justices of labourers' were appointed in every county to fix a rate of wages to be observed in the district, and the duty of executing the Statutes of Labourers was often entrusted to the men who were justices of the peace. This was the first important administrative function of the justices but by the end of the Middle Ages they were, as we shall see, to become the local government authority for the county in place of the sheriff and his courts. Regular meetings of the county justices became necessary, and in 1362 they were directed to meet together in session four times a year. This is the orgin of the more modern 'quarter sessions' of the justices. . . .

"The summary jurisdiction of the justices has grown up in a haphazard fashion from the sixteenth century onwards. Statute after statute created new offences triable summarily without a jury before one justice, or more often two, and at last, in the nineteenth century, the procedure in these summary trials was regulated by statute. The phrase 'petty sessions,' which came into use at the beginning of the nineteenth century to designate sittings of the justices out of quarter sessions, was eventually adopted by the Legislature. Every county was divided into a number of petty sessional divisions, often co-terminous with the old hundreds and their only practical survival, each provided with a petty sessional court house, sitting in which two justices or a stipendiary constitute a petty sessional court." (Radcliffe & Cross, The English Legal System (6th ed. 1977) 71-72, 355-356.)

[16]Thus, the Bastardy Act of 1845 provided in pertinent part: " 'And whereas by the said recited Act it is enacted, that where any Woman shall apply to the Justices at a Petty Session for an Order upon the Person whom she shall allege to be the Father of her Bastard Child,

no case squarely facing the issue whether an alleged father was entitled to a jury under the 1844 and 1845 enactments (perhaps because the language of the statutes is so plain), the pertinent reported cases frequently refer to determinations of fact by the Justices of the Peace without juries under the Poor Law. (See, e.g., *Reg.* v. *Glynne, supra,* 7 Q.B. at pp. 23, 25; *Rex* v. *Tedford,* T.T. 8 & 9 G.2. Burr. S.C. 57, cited in 2 Bott's Poor Laws (1827) pp. 547, 757;[17] see also *Cole* v. *Manning* (1877) 2 Q.B.D. 611 [decided under Bastardy Laws Amendment Act of 1872 (35 & 36 Vict. ch. 65) which provided for same hearing of evidence by the Justices as under prior amendments]; 4 Blackstone Commentaries (Jones ed. 1916) ch. 20, pp. 280-286.) The Poor Law amendments of 1844 and 1845 leave no doubt that paternity was to be adjudicated by the Justices of the Peace, not by a jury, in 1850.

■■ We conclude that since the common law in its statutory aspect in 1850 provided an action to establish paternity, and since there was then no right to a jury trial on the question, defendant had no right to a jury under article I, section 16, of our Constitution. (*People* v. *One 1941 Chevrolet Coupe, supra,* 37 Cal.2d at p. 300; see *Cyrus* v. *Haveson* (1976) 65 Cal.App.3d 306, 318 [135 Cal.Rptr. 246].)

---

*such Justices shall hear the Evidence of such Woman, and such other Evidence as she may produce, and shall also hear any Evidence tendered by or on behalf of the Person alleged to be the Father, and if the Evidence of the said Mother be corroborated in some material Particular by other Testimony to the Satisfaction of the said Justices,* they may make such Order as is therein set forth: And whereas Power is thereby given to the putative Father to appeal to the General Quarter Sessions of the Peace against such Order, but it is not therein set forth what Evidence the said General Quarter Sessions shall or may hear on the Trial of such Appeal, and Doubts have been raised as to whether the said Mother can be heard by the said Court of Quarter Sessions;' be it therefore enacted, That on the Trial of any such Appeal before any Court of Quarter Sessions *the Justices therein assembled, or the Recorder, (as the Case may be,) shall hear the Evidence of the said Mother, and such other Evidence as she may produce, and any Evidence tendered on behalf of the Appellant, and proceed to hear and determine the said Appeal in other respects according to Law, but shall not confirm the Order so appealed against unless the Evidence of the said Mother shall have been corroborated in some material Particular by other Testimony, to the Satisfaction of the said Justices in Quarter Session assembled, or the said Justices in Quarter Session assembled, or the said Recorder."* (8 & 9 Vict. ch. 10, § 6, italics added.)

"[T]he word 'recorder' shall be taken to apply to any person who shall preside as the judge at any court of general or quarter session held for any city, borough, liberty, or other place of limited jurisdiction." (2 Halsbury's Statutes of England, *op. cit. supra,* at p. 478.)

The Bastardy Act of 1845 also set forth a schedule of standard forms of pleading and practice under that act. (8 & 9 Vict. ch. 10, § 1.) The schedule of forms was in response to an age old problem described thusly in the 1845 act: "WHEREAS divers Questions have been raised as to the Validity of certain Orders in Bastardy made by Justices under the Act of the last Session of Parliament . . . which Questions are wholly beside the Merits of the Cases; and it is desirable to remove such Questions, . . ." (8 & 9 Vict. ch. 10, § 1.) One such form required the Justices of the Peace sitting at Petty Session to state expressly that they had heard the evidence and had the case "proved to us." (*Id.,* Eighth Schedule.)

[17]We have been unable to determine when the case was decided; the facts arose in 1730.

Defendant relies on *Clark* v. *Bradstreet* (1888) 80 Me. 454 [15 A. 56] and *Gaunt* v. *State* (1888) 50 N.J.L. 490 [14 A. 600], revd. *Gaunt* v. *State* (1890) 52 N.J.L. 178 [19 A. 135], for the proposition the issue of paternity was triable to a jury at common law. However, both cases arose several years following the adoption of the California Constitution and do not purport to consider the common law of 1850. More importantly, neither case discusses whether trial by jury was accorded as a matter of right. In short, neither case supports the proposition defendant has cited them for.

In *Kyne* v. *Kyne* (1940) 38 Cal.App.2d 122 [100 P.2d 806] the court concluded that in an action to establish paternity and support, paternity was a legal issue to be tried to the jury, whereas the amount of support should be tried to the court. (P. 133.) However, the court did not articulate the legal basis of the jury trial right on the paternity issue. And, although the *Kyne* court cited *Mensing* v. *Croter* (1930) 209 Cal. 318 [287 P. 336] (*ibid.*), the *Mensing* case does not discuss the jury trial issue. In the absence of any constitutional discussion in the case, we will presume *Kyne* located its jury trial right in a statute, presumably Code of Civil Procedure section 592, a conclusion with which we have no occasion to disagree in this case. Although defendant makes no contention he was wrongfully denied his statutory jury trial right, any such claim would be unavailing. By its enactment of section 892, the Legislature has clearly determined that the statutory jury trial right may be lost in the circumstances shown here. (See *Widson* v. *International Harvester Co.* (1984) 153 Cal.App.3d 45, 56 [200 Cal.Rptr. 136.)

B. *Even assuming defendant was entitled to a jury trial by article I, section 7, subdivision (a), of the California Constitution, defendant was not denied due process of law.*

■ Defendant contends he was denied due process under the state Constitution. Article I, section 7, subdivision (a), of the California Constitution provides in pertinent part, "A person may not be deprived of life, liberty, or property without due process of law . . . ."

We have previously noted that "rules governing invocation of procedural due process rights under the state Constitution are not always the same as rules adopted by the United States Supreme Court for invocation of federal due process rights." (*Schultz* v. *Regents of University of California* (1984) 160 Cal.App.3d 768, 780 [206 Cal.Rptr. 910].)

On occasion, our Supreme Court has concluded due process of law requires a trial by jury in certain proceedings. (See, e.g., *Conservatorship of Roulet* (1979) 23 Cal.3d 219, 235 [152 Cal.Rptr. 425, 590 P.2d 1] [unanimous verdict by jury required by due process in conservatorship proceedings

under Lanterman-Petris-Short Act]; *People* v. *Smith* (1971) 5 Cal.3d 313, 317 [96 Cal.Rptr. 13, 486 P.2d 1213] [due process required jury trial in proceedings to extend commitment to California Youth Authority]; *In re Gary W.* (1971) 5 Cal.3d 296, 307 [96 Cal.Rptr. 1, 486 P.2d 1201] [same].) In this case, we need not resolve the question whether the due process clause of the California Constitution requires a jury trial in paternity actions. We shall assume for purposes of argument it does. (But see *County of Los Angeles* v. *Soto, supra,* 35 Cal.3d at pp. 489-490 [defendant must knowingly waive right to "judicial hearing" or "trial"; no mention made of right to jury.]

California courts have frequently upheld the ultimate sanction of dismissal or default in the face of due process challenges. (See, e.g., *Kahn* v. *Kahn* (1977) 68 Cal.App.3d 372, 382 [137 Cal.Rptr. 332]; *MacDonald* v. *Joslyn* (1969) 275 Cal.App.2d 282, 290 [79 Cal.Rptr. 707, 35 A.L.R.3d 641]; *Jacuzzi* v. *Jacuzzi Bros., Inc.* (1966) 243 Cal.App.2d 1, 16 [52 Cal.Rptr. 147]; see also *Williams* v. *Travelers Ins. Co.* (1975) 49 Cal.App.3d 805, 810 [123 Cal.Rptr. 83]; *Petersen* v. *City of Vallejo* (1968) 259 Cal.App.2d 757, 777-784 [66 Cal.Rptr. 776]; *Unger* v. *Los Angeles Transit Lines, supra,* 180 Cal.App.2d 172, 186-188.) The rationale is the same as that set forth by the federal courts, i.e., that the refusal to produce information is tantamount to an admission that the claim or defense is unfounded. (*Ibid.*)

We perceive no reason why this rule should give way where the due process clause of the state Constitution otherwise affords a jury trial. Due process does not allow a defendant wrongfully to withhold information crucial to an ascertainment of truth and thereafter to try his case to a jury upon the presentation of evidence which has been made unfairly incomplete by his wrong. Defendant must locate authority for playing on a tilted table in a source other than the fairness guaranteed by the due process clause of our state Constitution.

Of course, it is a cardinal rule of California discovery practice, probably of constitutional origin, that discovery sanctions must be suitable to enable the party seeking discovery to obtain the objects of discovery; the sanction must not put the prevailing party in a better position than if discovery had been obtained nor may the sanction be a form of punishment. (See *Motown Record Corp.* v. *Superior Court* (1984) 155 Cal.App.3d 482, 489-490 [202 Cal.Rptr. 227] and authorities cited therein.) Here, without the results of the blood tests, we cannot know whether County has been put in a better position than if the blood tests had been obtained. However, as we have explained, our ultimate uncertainty is caused by defendant's wrongful refusal to take the blood tests. In these circumstances, defendant must bear the consequences of the uncertainty. (See *Highland Ranch* v. *Agricultural Labor Relations Bd., supra,* 29 Cal.3d at p. 863.) We conclude the invocation of section

892 to establish paternity did not deny defendant due process of law under the state Constitution.

DISPOSITION

The judgment is affirmed.

Evans, Acting P. J., and Carr, J., concurred.

A petition for a rehearing was denied June 8, 1987, and appellant's petition for review by the Supreme Court was denied July 29, 1987.