[No. A065055. First Dist., Div. Five. June 14, 1995.]

CITY AND COUNTY OF SAN FRANCISCO, Plaintiff and Appellant, v. JOSE CARTAGENA, Defendant and Respondent.

COUNSEL

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Mary A. Roth, and Carol Ann White, Deputy Attorneys General, for Plaintiff and Appellant.

Christopher C. Welch for Defendant and Respondent.

OPINION

PETERSON, P. J.—This case considers the simple question of whether a paternity blood test may be judicially compelled at the behest of a father who is seeking to vacate a three-year-old paternity judgment. Appellant City and County of San Francisco (City) contends that the court abused its discretion in ordering paternity blood testing at the behest of respondent Jose Cartagena, the judicially determined father, prior to a ruling on Cartagena's motion to set aside the paternity judgment. The City claims that the blood

test is primarily relevant to the issue of paternity, and while the paternity judgment exists, the issue is res judicata. We agree with the City and find that, at this juncture, the court abused its discretion in judicially compelling the child and mother to undergo blood tests.

## I. FACTS AND PROCEDURAL HISTORY

On April 24, 1990, the City brought a complaint under Welfare and Institutions Code sections 11350.1 and 11475.1 for child support, reimbursement of public assistance, and establishment of paternity against Cartagena. The action alleged Cartagena was the father of a baby boy named Emmanuel Cartagena born in September 1989. Cartagena, who was not represented by counsel, entered into a stipulation on June 28, 1990, wherein he acknowledged being Emmanuel's father. In the documents signed by Cartagena, he was advised that if he denied being Emmanuel's father he had "the right to have blood tests and to have a court trial." Pursuant to the stipulation, a judgment issued establishing Cartagena's paternity on July 2, 1990. It appears of record that Cartagena has established a father-son relationship with Emmanuel, holding him out as his child, exercising regular visitation privileges, and providing him with material items such as clothing.

Three years after the stipulated judgment of paternity was entered, Cartagena for the first time questioned Emmanuel's paternity. On August 5, 1993, Cartagena, represented by counsel, sought to vacate the stipulated judgment. In supporting affidavits, it was asserted that the custodial parent, Ursula Thomas, had told various mutual acquaintances that Cartagena was not Emmanuel's father. Cartagena asked the court to relieve him of the legal effect of his stipulation to paternity because it was induced by the fraudulent misrepresentation of the child's mother that Cartagena was Emmanuel's father. He also asked the court to order blood testing of the mother and child in order to verify his paternity.

The parties stipulated that a superior court commissioner could hear the matter and make recommendations to the presiding judge of the superior court. A hearing was held in which Poneva Knox, Cartagena's present girlfriend, was the sole witness. She testified that on two separate occasions she had heard Thomas say that Cartagena was not Emmanuel's father. On cross-examination, Poneva Knox admitted that there was ill will between her and Thomas, which, at one point, had escalated to a physical altercation.

At the conclusion of the hearing, the commissioner took the matter of vacating the judgment of paternity under submission and recommended to the presiding judge that blood testing be ordered in the interim. The purpose

for ordering blood testing was stated on the record: "[I]t's absolutely in the best interest of this child before time goes on that the child has some sense of whether this person is, in fact, his biological father."

Counsel for the City vigorously opposed the proposed blood testing, repeatedly arguing that as long as the final judgment establishing Cartagena's paternity was in existence an order for blood testing was inappropriate. The presiding judge adopted the commissioner's recommendations and granted Cartagena's blood testing request. The City took a timely appeal.

## II.  Discussion

At the outset, the posture of this case bears emphasizing. The challenged blood testing order was made at the same time that the legal issue of vacating or setting aside the paternity judgment was taken under submission. Consequently, this case comes before us with a judgment of paternity that is challenged but is still in effect.[1] The precise and controlling issue presented by the appeal was aptly framed by Cartagena, albeit in the form of an assertion: "Ordering blood tests was within the statutory authority of the trial court and did not require an implicit vacating of the existing [paternity] judgment."

By the arguments advanced on appeal, it is clear Cartagena seeks admission of blood test results in the hope that it will substantiate his claim that he is not the natural father of Emmanuel and to help prove that he was fraudulently induced by the child's mother to stipulate to paternity. We consider each of these points individually.

### A.  Establishing Nonpaternity

As Cartagena points out, ordinarily a blood test is a proper aspect of discovery in a paternity action as being a highly accurate indicator of paternity. (See Fam. Code, § 7551; *County of El Dorado* v. *Schneider* (1987) 191 Cal.App.3d 1263, 1275 [237 Cal.Rptr. 51] (*Schneider*).) However, the present case is not in the ordinary posture because we are not dealing with an original proceeding to determine paternity. A judgment of paternity, which is entitled to res judicata effect, currently exists. Numerous cases support giving conclusive effect to a judicial finding of paternity and bar the parties from using blood test evidence in a subsequent proceeding to overturn a paternity determination.

---

[1]We refuse to indulge in the presumption, advanced by the City, that by ordering the blood tests, the court implicitly granted Cartagena's motion to vacate the paternity judgment.

In *De Weese* v. *Unick* (1980) 102 Cal.App.3d 100, 104 [162 Cal.Rptr. 259], the court held that statutory provisions regarding blood tests to determine paternity are only applicable in proceedings where the issue of paternity is not resolved and no final judgment of paternity has been entered. In that case, after taking a blood test which did not exclude appellant as the putative father, appellant "chose to stipulate that he was the father, knowing full well that he had the opportunity of unlimited discovery and other technological processes at his means to ascertain the paternity of the child." (*Id.* at p. 107.) Appellant attempted to relitigate the issue of paternity some four and a half years later based on the fact that a new blood test with greater accuracy had been developed. The court held that the paternity judgment was entitled to res judicata effect and, hence, barred ordering new blood testing.

The court in *City and County of San Francisco* v. *Stanley* (1994) 24 Cal.App.4th 1724 [30 Cal.Rptr.2d 106] (*Stanley*) recently rejected an attempt to reopen a paternity judgment based on postjudgment blood tests. In that case, Stanley was adjudicated the father of the child by his own admission. In a hearing on modification of the support order, the court ordered blood testing for the mother and child after Stanley defended by disputing paternity. The appellate court found the court abused its discretion in ordering blood testing because the issue of paternity was conclusively established by the final judgment of paternity entered on Stanley's stipulation. (*Id.* at p. 1729;[2] see also *County of San Diego* v. *Hotz* (1985) 168 Cal.App.3d 605, 608-609 [214 Cal.Rptr. 658]; *County of Alameda* v. *Sampson* (1980) 104 Cal.App.3d 584, 590 [163 Cal.Rptr. 915].) These cases effectively foreclose Cartagena's attempt to deny paternity through use of postjudgment blood tests as long as the 1990 judgment establishing that he is the legal father of Emmanuel is in existence.

## B. *Collateral Attack on Paternity Judgment*

Notwithstanding the bar to a subsequent action that may result from application of the doctrine of res judicata, a party may still seek relief from a final judgment by appealing to the equitable power of the court. Under certain limited circumstances a court, sitting in equity, can set aside or modify a valid final judgment obtained by fraud, mistake, or accident. (For a complete discussion of this topic, see our prior opinions in *In re Marriage of Stevenot* (1984) 154 Cal.App.3d 1051 [202 Cal.Rptr. 116] (*Stevenot*), and

---

[2]*Stanley, supra,* 24 Cal.App.4th 1724 is not only legally similar to our case—it is factually similar as well. The same commissioner who ordered the blood tests in that case ordered the blood tests in the instant case.

*In re Marriage of Alexander* (1989) 212 Cal.App.3d 677 [261 Cal.Rptr. 9] (*Alexander*).)[3]

Cartagena seeks blood test results in the hope this evidence will help prove that he was fraudulently induced by the child's mother to stipulate to paternity. Whatever the outcome of the blood testing, it will not be persuasive on the type of fraud necessary to set aside the paternity judgment. ▉ The type of fraud necessary to vacate a final judgment is extrinsic fraud, not fraud which is intrinsic to the trial of the case itself. (*Stevenot, supra,* 154 Cal.App.3d at p. 1068.) Extrinsic fraud occurs when a party is deprived of the opportunity to present his claim or defense to the court; where he was kept ignorant or, other than from his own negligence, fraudulently prevented from fully participating in the proceeding. (*Ibid.*) Examples of extrinsic fraud are: concealment of the existence of a community property asset, failure to give notice of the action to the other party, and convincing the other party not to obtain counsel because the matter will not proceed (and then it does proceed). (*Id.* at p. 1069.) The essence of extrinsic fraud is one party's preventing the other from having his day in court.

The recent case of *In re Marriage of Grissom* (1994) 30 Cal.App.4th 40 [35 Cal.Rptr.2d 530] is the perfect example of extrinsic fraud. In that case, extrinsic fraud was found when wife signed a stipulated agreement with respect to property division and support, based on her husband's fraudulent misrepresentation that the document she was signing would serve to dismiss the dissolution proceedings. (*Id.* at p. 52.) In sum, "Extrinsic fraud usually arises when a party is denied a fair adversary hearing because he has been 'deliberately kept in ignorance of the action or proceeding, or in some other way fraudulently prevented from presenting his claim or defense.' [Citation.]" (*Kulchar* v. *Kulchar* (1969) 1 Cal.3d 467, 471 [82 Cal.Rptr. 489, 462 P.2d 17, 39 A.L.R.3d 1368].)

By contrast, fraud is intrinsic and not a valid ground for setting aside a judgment when the party has been given notice of the action and has had an opportunity to present his case and to protect himself from any mistake or fraud of his adversary but has unreasonably neglected to do so. (*Stevenot, supra,* 154 Cal.App.3d at p. 1069.) Such a claim of fraud goes to the merits of the prior proceeding which the moving party should have guarded against

---

[3]A stipulation to paternity is also voidable if a parent who was unrepresented by counsel can establish that he was not advised of his right to trial; that he was unaware of that right; and that if he had been properly advised, he would not have executed the agreement. (See *County of Los Angeles* v. *Soto* (1984) 35 Cal.3d 483, 486 [198 Cal.Rptr. 779, 674 P.2d 750].) Cartagena did not attempt to make this evidentiary showing below. Consequently, he is barred from making this argument on appeal. (See *Sanchez* v. *Truck Ins. Exchange* (1994) 21 Cal.App.4th 1778, 1787 [26 Cal.Rptr.2d 812].)

at the time. Where the defrauded party has failed to take advantage of liberal discovery policies to fully investigate his claim, any fraud is intrinsic fraud. (*Ibid.*) The recent case of *In re Marriage of Melton* (1994) 28 Cal.App.4th 931 [33 Cal.Rptr.2d 761] provides an example of intrinsic fraud which will not trigger the court's revisory power. In that case, the misrepresentation of the value of a marital asset, favorable to one party, was found to constitute intrinsic fraud because the aggrieved party was not prevented from discovering the asset's true value. (*Id.* at p. 938; see also, *Alexander, supra,* 212 Cal.App.3d at p. 684 [Inequities in a property settlement agreement, prepared by husband, constituted intrinsic fraud when wife was not deliberately kept in ignorance of the proceeding or prevented by husband from presenting her claims.].)

As illustrated by these cases, in demonstrating extrinsic fraud, it is insufficient for a party to come into court and simply assert that the judgment was premised upon false facts. The party must show that such facts could not reasonably have been discovered prior to the entry of judgment.

▪ Cartagena argues that Thomas's misrepresentations he was Emmanuel's father constituted extrinsic fraud, which would justify the court vacating the 1990 paternity judgment, and that the "blood test evidence is crucial in determining the question of fraud." In *Brown* v. *Superior* Court (1979) 98 Cal.App.3d 633 [159 Cal.Rptr. 604] (*Brown*), a similar argument was made. In that case, Brown moved for blood tests of the mother and child 10 years after he had admitted paternity during a prior divorce proceeding. He wished to reopen the issue of paternity based on hearsay evidence that the mother had informed others that Brown was not the child's father. (*Id.* at p. 635.) Based on this evidence, the lower court ordered blood tests. The Court of Appeal reversed, noting Brown had "shown no evidence of extrinsic fraud or mistake." (*Id.* at p. 636; accord, *In re Marriage of Guardino* (1979) 95 Cal.App.3d 77, 92-93 [156 Cal.Rptr. 883].) The appellate court firmly rejected the position, advanced by Cartagena herein, that blood test evidence might assist him in demonstrating extrinsic fraud: "[T]he blood tests are directed to the ultimate issue, paternity. *They will reveal nothing about whether extrinsic fraud was practiced upon Raymond Brown or whether there was some extrinsic mistake.*" (*Brown, supra,* 98 Cal.App.3d at p. 636, italics added.)

From the remarks made on record, it appears the commissioner considered the ordering of blood tests to be in Emmanuel's best interest in learning the identity of his biological father. In the unique circumstances of this case, the best interest analysis is a double-edged sword. It is true that the blood tests ordered by the court could "play a crucial role in the accurate determination of paternity." (*Schneider, supra,* 191 Cal.App.3d at p. 1275.) But Cartagena

is not entitled to contest paternity until the prior judgment is vacated. The blood test evidence would have no persuasive value in proving extrinsic fraud—the critical issue at this juncture. In such a situation, the court's blood testing order may arguably have the potential of depriving Emmanuel of the emotional support of the man he has known as his father (an issue we do not decide) without really bearing on the issues necessary to set aside the judgment of paternity. As pointed out in *Stanley, supra,* the best interests of the child could equally be served by allowing the child, at some point in the future, to make his own decision as to whether he wishes to reopen the issue of his paternity. (24 Cal.App.4th at p. 1729.)

### C. *Conclusion*

In this case, there was no judicial determination on whether Cartagena had proven the requisite evidentiary basis to vacate the judgment of paternity. Before Emmanuel and his mother may be forced to undergo blood testing, the issue of vacating the paternity judgment must be resolved. If the court rules Cartagena has met his burden of proof and sets aside that judgment, the paternity of the child is *then* placed directly in issue and the blood test becomes a proper subject of discovery. If the court rules Cartagena is not entitled to set aside the judgment, he is barred from challenging the paternity determination and blood test evidence would provide him no legal recourse. Consequently, the order requiring Emmanuel and his mother to take blood tests at this juncture was premature and an abuse of the court's discretion.

### III. DISPOSITION

The judgment is reversed.

King, J., and Haning, J., concurred.

A petition for a rehearing was denied July 13, 1995, and respondent's petition for review by the Supreme Court was denied August 31, 1995. Mosk, J., Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.