[No. G030352. Fourth Dist., Div. Three. Apr. 8, 2003.]

JEFFREY HEYMAN, Plaintiff and Appellant, v.
FRANCHISE MORTGAGE ACCEPTANCE CORPORATION et al.,
Defendants and Respondents.

## COUNSEL

Miller, Starr & Regalia, George B. Speir, Thomas S. McConnell; Stanbury, Fishelman, Wisner & Adsit and Bruce C. Fishelman for Plaintiff and Appellant.

Baker & Hostetler and Peter W. James for Defendants and Respondents.

## OPINION

**O'LEARY, J.**—Jeffrey Heyman appeals the judgment in his breach of contract and fraud action. He had voluntarily dismissed the identical lawsuit eight years earlier after settling with the defendants. Heyman challenges the trial court's refusal to set aside the dismissal of the prior action on the ground it had been procured through extrinsic fraud and he contends the trial court improperly excluded evidence that would have enabled him to prove extrinsic fraud. We affirm.

### FACTS AND PROCEDURE

*The 1992 Action*

In 1992, Heyman sued Franchise Mortgage Acceptance Corporation (FMAC), Wayne Knyal, Dennis Fitzpatrick, Arthur Brazy, and other defendants. Heyman alleged that in 1988, his research on the loan default rate of fast food franchisees had knocked conventional lending wisdom on its head—the default rate was "actually very low." Thus, he "originated and developed the idea of a securitized pool of franchisee loans."

Knyal and Fitzpatrick were principals of CBI Financial Services. Heyman met with them and confidentially explained his plan for securitizing franchisee loans. CBI had an ongoing relationship with Taco Bell, but had been

unsuccessful at setting up a franchisee loan program for Taco Bell franchisees. Heyman, Knyal, and Fitzpatrick entered into an oral joint venture agreement to develop Heyman's loan program; CBI and Heyman would split the profits. In January 1989, Knyal confirmed the joint venture in writing, and CBI entered into an agreement with Taco Bell to initiate Heyman's program.

By July 1989, Knyal had begun to shut Heyman out of the business. He ceased "regular communications" with Heyman and concealed information about the joint venture's progress. In 1990, CBI declared bankruptcy and assigned its interest in the joint venture to FMAC, a corporation in which Knyal and Brazy were principals. By 1991, FMAC had secured financing for up to $100 million in franchise mortgage loans for Taco Bell franchisees and had actually made over $50 million worth of loans. Needless to say, Heyman had not seen a dime of the profits.

Heyman's 1992 complaint contained breach of contract, accounting, and tort causes of action. In November 1992, Heyman entered into a settlement with Knyal, Fitzpatrick and FMAC. He accepted $80,000 in full settlement of the dispute and he subsequently dismissed the entire action with prejudice.

*The Current Action*

Heyman filed the current action in 1999 against FMAC, Knyal, and others. After restating the basic factual allegations from the 1992 complaint, he alleged that while the 1992 action was pending, he had requested a full accounting of the venture. Knyal had given Heyman a document indicating that Knyal's interest in loans being made by FMAC would yield about $514,000 in earnings "under the most optimistic scenario," and that FMAC had less than $150,000 cash on hand. While the 1992 action was pending, Knyal and Brazy made verbal representations to Heyman that the document accurately represented FMAC's financial picture. In reliance on those representations, Heyman settled the 1992 action for $80,000. Heyman alleged that in fact, the financial prospects of FMAC were much better than represented. Heyman alleged Knyal had concealed that FMAC was going to receive an estimated $4.7 million in revenues from future franchise loans, and Knyal's earning would be about $1.7 million. FMAC had applications pending for another $10 million in franchisee loans. In 1997, Knyal took the business public, and in the initial public offering of shares it was valued at about $130 million. Heyman alleged that when he settled the 1992 action he was unaware of the true facts, and did not learn them until they became public in another action involving Knyal and some of his business associates.

The first three causes of action in the current complaint were to set aside Heyman's settlement of the 1992 action—fraud, constructive fraud, and rescission. The court ordered those causes of action bifurcated.

*Trial Evidence*

At trial, Heyman contended Knyal had created and used deceptive financial records to induce him to settle the 1992 action. Specifically, he claimed that Knyal hid from him the substantial revenues FMAC would receive from servicing the franchisee loans. It was uncontroverted that the only financial record Heyman reviewed prior to entering into the 1992 settlement was a 10-page financial statement given to him by Knyal during settlement talks. Heyman conducted no formal discovery in the 1992 action and although he had been offered the opportunity to examine all of FMAC's books and records, he did not.[1]

Heyman claimed the 10-page financial statement, as it turned out, improperly consolidated loan servicing revenues with loan servicing expenses, making it look as though FMAC had no profit on loan servicing. In fact, Heyman claimed, loan servicing revenues were being diverted to a separate holding company owned by Knyal. Heyman testified that he first learned about Knyal's deceptive records in 1999 after another of Knyal's partners, Maurice DeWald, successfully sued Knyal for fraud involving the loan servicing rights.

Following a two-day bench trial, the court ruled that any fraud committed by Knyal was intrinsic to the 1992 action, not extrinsic, and thus the 1992 dismissal could not be set aside. Accordingly, it granted judgment for the defendants, Heyman appeals.

## DISCUSSION

 ██ ██ The issue presented here is mercifully narrow: All agree that Heyman's voluntary dismissal of his 1992 action operates as an absolute bar to the present litigation unless Heyman can establish that dismissal was obtained through *extrinsic* as opposed to *intrinsic* fraud.[2]

---

[1] The financial statement was an exhibit at trial. Additionally, other financial records of FMAC, which Heyman claims demonstrate Knyal's fraudulent conduct were also admitted into evidence at trial. On appeal, Heyman did not file a rule 18 notice (Cal. Rules of Court, rule 18) designating any exhibits to be considered by this court. Accordingly, we cannot assume that any of this documentary evidence supports Heyman's position. (See *Western Aggregates, Inc. v. County of Yuba* (2002) 101 Cal.App.4th 278, 291 [122 Cal.Rptr.2d 648] ["Where exhibits are missing we will not presume they would undermine the judgment"].)

[2] Much of the respondents' brief is devoted to a discussion of the litigation privilege contained in Civil Code section 47, subdivision (b). The discussion is irrelevant because

■ "Extrinsic fraud occurs when a party is deprived of his opportunity to present his claim or defense to the court, where he was kept in ignorance or in some other manner fraudulently prevented from fully participating in the proceeding. [Citation.] Examples of extrinsic fraud are: concealment of the existence of a community property asset, failure to give notice of the action to the other party, convincing the other party not to obtain counsel because the matter will not proceed (and it does proceed). [Citation.] A party's representation of the value of an asset, favorable to himself, does not constitute extrinsic fraud. [Citation.] Extrinsic mistake involves the excusable neglect of a party. [Citation.] When this neglect results in an unjust judgment, without a fair adversary hearing, and the basis for equitable relief is present, this is extrinsic mistake. [Citation.] Reliance on an attorney who becomes incapacitated, or incompetence of the party without appointment of a guardian ad litem, are examples of extrinsic mistake. [Citation.] [¶] Fraud is intrinsic and not a valid ground for setting aside a judgment when the party has been given notice of the action and has had an opportunity to present his case and to protect himself from any mistake or fraud of his adversary, but has unreasonably neglected to do so. [Citation.] Such a claim of fraud goes to the merits of the prior proceeding which the moving party should have guarded against at the time. *Where the defrauded party failed to take advantage of liberal discovery policies to fully investigate his or her claim, any fraud is intrinsic fraud.* [Citation.]" (*In re Marriage of Melton* (1994) 28 Cal.App.4th 931, 937-938 [33 Cal.Rptr.2d 761], italics added; see also *Home Ins. Co. v. Zurich Ins. Co., supra,* 96 Cal.App.4th at p. 26; *City and County of San Francisco v. Cartagena* (1995) 35 Cal.App.4th 1061, 1067 [41 Cal.Rptr.2d 797].)

■ The trial court here correctly concluded the alleged fraud of Knyal in securing Heyman's dismissal of the 1992 action through misleading statements about the value of FMAC (or of the loan servicing rights) was *intrinsic.* Heyman settled his action upon reviewing a single 10-page financial statement. He conducted no formal discovery and undertook no review of the financial records of the company he claimed to have an interest in. The court noted that the financial records produced at this trial were "a good [four] inches thick." But, as the court pointed out in ruling, because Heyman did not conduct any formal discovery in the 1992 action, it is impossible to know what he would have learned about his fraud claim and the financial condition of FMAC.

*Home Ins. Co. v. Zurich Ins. Co., supra,* 96 Cal.App.4th 17, is instructive. There the insurer's attorney misrepresented the policy limits to be $15,000,

although the litigation privilege bars a direct action for fraud committed in a judicial proceeding, it "does not apply to an equitable action to set aside a settlement agreement for extrinsic fraud." (*Home Ins. Co. v. Zurich Ins. Co.* (2002) 96 Cal.App.4th 17, 26 [116 Cal.Rptr.2d 583].)

when they were in fact $500,000. The injured party's attorney conducted no discovery, but settled the underlying suit for $15,000. The court held the fraud to have been intrinsic because, "A reasonable investigation and use of discovery would have disclosed the true extent of insurance coverage." (*Id.* at p. 27.) Similarly, we must agree with the trial court here that Knyal's alleged misstatements about the financial condition of FMAC and the profitability of loan servicing rights were intrinsic where they related to the value of the company, and the loan revenues were the very subject of the lawsuit and Heyman conducted no investigation or discovery into the financial accounts of the company.

Heyman's heavy reliance on *Sime v. Malouf* (1949) 95 Cal.App.2d 82 [212 Cal.Rptr.2d 946, 213 P.2d 788], is misplaced. The facts in that case were extraordinarily complicated involving a sophisticated conspiracy involving some of the directors and officers of a corporation for which the plaintiff was working. The action was the plaintiff's direct action for the fraud perpetrated by those directors and others against him. Only some of the acts pertained to a lawsuit against the corporation in which the plaintiff had filed a cross-complaint and which the plaintiff had been fraudulently induced to settle for far less than the actual value of his interests. The court rejected the defendants' assertion that the plaintiff's settlement of the one action in which he was involved, and in which most of the defendants were not parties, released them from liability for their fraudulent acts. Furthermore, it rejected the defendants' claim that the plaintiff would have uncovered the fraud had he conducted further discovery in the underlying action. "Plaintiff could not fairly have been charged with notice of facts which he could have learned only out of the mouths of the conspirators, who were successfully endeavoring to conceal them." (*Id.* at p. 107.) *Sime* was not an action to set aside the judgment in the action in which the plaintiff was involved and thus it did not distinguish between extrinsic and intrinsic fraud. But we are satisfied that *Sime* presented a clear case of *extrinsic* fraud, because much of the fraud was unrelated to the underlying lawsuit.

By contrast, Heyman settled his 1992 action based on Knyal's alleged misrepresentations about the very subject matter of the litigation: the profitability of the franchisee loans and the financial condition of FMAC. But Heyman conducted no formal discovery to obtain the financial documents relating to those issues. There is no evidence of an elaborate conspiracy to keep those records or the information from him. He simply chose not to investigate further.

Heyman contends two evidentiary errors by the trial court precluded him from proving the alleged fraud was extrinsic. We find no error.

First, Heyman sought to have Knyal's former partner, DeWald, testify. DeWald had successfully sued Knyal in 1999 for fraud involving the same

franchisee loan servicing rights that Heyman claimed Knyal had lied to him about. Heyman offered that DeWald would testify the "books" created by Knyal to conceal his diversion of loan servicing revenues were "sufficiently deceptive to have deceived Mr. DeWald despite his sophistication as an accountant." Thus, Heyman argues, DeWald's testimony would have proved that the financial records Knyal gave Heyman to induce him to settle were deceptive, and Knyal intended to deceive Heyman with them. But as the court noted, whether there was fraud was not relevant to the issue of whether the alleged fraud was extrinsic or intrinsic to the lawsuit. The court did not err in excluding the testimony.

Heyman also complains the court improperly refused to permit him to present expert testimony from Terry Lloyd. Heyman argued that Lloyd's testimony would prove that even had Heyman done formal discovery and looked at the financial records of FMAC, they would not have revealed that loan servicing revenues were being diverted by Knyal. But Heyman conceded that Lloyd had not reviewed the underlying books and financial records of FMAC that would have been available to Heyman when he settled his case in 1992. Rather, his testimony would be based upon his review of the document Heyman received from Knyal and an audit report of FMAC prepared in 1993 for the 1992 fiscal year. The trial court did not abuse its discretion in excluding Lloyd's expert testimony. The expert witness was in no position to testify about what Heyman would have found had he reviewed the books and records of FMAC when he had not reviewed those records.

The judgment is affirmed. The respondents are awarded their costs on appeal.

Sills, P. J., and Rylaarsdam, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 9, 2003. George, C. J., and Brown, J., did not participate therein.