Filed 11/6/13  Pemstein v. Pemstein CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MARTIN PEMSTEIN,<br><br>     Plaintiff and Appellant,<br><br>     v.<br><br>HAROLD PEMSTEIN,<br><br>     Defendant and Respondent. | G047338<br><br>(Super. Ct. No. 30-2009-00119103)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Gregory H. Lewis, Judge.  Affirmed.

Manahan, Flashman & Brandon, Amanda E. Manahan and Jeffrey S. Flashman for Plaintiff and Appellant.

Harold Pemstein, in pro. per., for Defendant and Respondent.

Martin Pemstein appeals from the judgment he obtained against his brother Harold Pemstein[1] in this action for damages relating to rent defaults on leases for two commercial buildings. He challenges the amount of damages awarded. We find no error and affirm.

FACTS AND PROCEDURE

*Background*

Martin and Harold have been battling each other for years over the breakup of their family business comprised of a corporation called The Pemma Corporation (Pemma) and a partnership called HMS Holding Company (HMS). The corporate dissolution action has already been the subject of many appeals, including one filed concurrently with this opinion (*Pemstein v. Pemstein* (Nov. 6, 2013, G047107) [nonpub. opn.]; *Pemstein v. Pemstein* (May 16, 2011, G043349) [nonpub. opn.]; *Pemstein v. Pemstein* (June 9, 2004, G030217) [nonpub. opn.]; *Pemstein v. Pemstein* (June 9, 2004, G029394) [nonpub. opn.]; *Pemstein v. The Pemma Corporation* (June 9, 2004, G031227) [nonpub. opn.]).

The real properties that are the subject of this action are two commercial buildings located in Santa Ana at 515 South Santa Fe Street (the 515 Building), and 519 South Santa Fe Street (the 519 Building). Originally, HMS was the owner of the buildings, and Pemma was the lessee. During the pendency of the corporate dissolution action, Pemma and HMS filed for bankruptcy. In 2006, the bankruptcy court entered an order allowing for Martin to become the sole owner of both buildings and for Harold to become the lessee of both buildings. The bankruptcy trustee created new leases for each

---

[1]    We hereafter refer to the parties by their first names for ease of reading and to avoid confusion, and not out of disrespect. (*In re Marriage of James & Christine C.* (2008) 158 Cal.App.4th 1261, 1264, fn. 1.)

2

building between HMS and Pemma and then assigned them to Martin and Harold respectively.

The two leases were identical. The lease term was for four years from January 1, 2007, to December 31, 2010. The monthly rent was $3,657.50 for the first year, subject to a three percent annual increase each year thereafter. The leases provided for rent to be paid on the first day of each month and provided for imposition of late charges and interest after five days. The leases also contained the following paragraph 3.1, pertaining to early termination of the lease term, which provided in relevant part: "While Lessee is in bankruptcy, Lessee . . . may terminate this Lease for any reason whatsoever, after providing thirty (30) days written notice to Lessor. If this Lease is terminated by Lessee during its bankruptcy, the maximum claim that Lessor may have against Lessee for early termination shall be four (4) months of rent. After Lessee's bankruptcy, Lessee may terminate this Lease for any reason by providing at least 120 days written notice, and upon such early termination, Lessee shall pay to Lessor a lump sum amount equal to four (4) months of rent."

*The Complaint*

Martin filed the instant action against Harold in May 2009, for damages relating to rent defaults on both buildings.

As to the 515 Building, Martin alleged that on October 30, 2007, Harold gave written notice of his intent to terminate the lease, saying he would be off the premises by November 30, 2007. Harold did not fully vacate the premises until December 20, 2007. Harold paid Martin the December rent but no rent thereafter, and did not make a lump sum payment equal to four months' rent.

As to the 519 Building, Martin alleged Harold was routinely late in his rent payments. On December 7, 2007, Martin served Harold with a three-day notice to perform covenant or quit, and on January 20, 2008, Martin commenced an unlawful detainer action. Martin obtained a judgment in the unlawful detainer action, entered

3

May 7, 2008, and served on Harold May 8, giving possession of the premises back to Martin, and ordering Harold to pay Martin $1,463 in late fees for the months of August 2007 through November 2007. The unlawful detainer judgment stated Harold "may in the future become liable for daily damages, alleged in the complaint to be $139.73 per day, [but] such future damages are not properly included in this *judgment* . . . ." Harold did not vacate the premises until June 2008, and Martin was not able to find a new tenant. Martin alleged Harold was liable for rent throughout the remainder of the lease term, plus other damages. Martin's complaint also contained a cause of action seeking to recover attorney fees he had incurred prosecuting the unlawful detainer action.

*The Trial*

The matter proceeded to a bench trial in April 2012, conducted solely upon the parties' trial briefs, argument of counsel, and exhibits submitted to the court. The joint exhibit list describes 90 exhibits that were provided to the court. Some of the exhibits (we have been able to identify approximately 26 of them) are attached to the trial briefs included in the clerk's transcript, but most of the exhibits have not been provided to us. Martin's designation of the record on appeal identifies only one exhibit to be included in the clerk's transcript record on appeal (see Cal. Rules of Court, rule 8.122(a)(3))—a notice of eviction—but that exhibit is not in the clerk's transcript. Martin has not filed a rule 8.224 notice (Cal. Rules of Court, rule 8.224) designating any trial exhibits to be considered by this court, nor have any of the other exhibits been transmitted to this court.[2]

---

[2] "Where exhibits are missing we will not presume they would undermine the judgment. [Citation.]" (*Western Aggregates, Inc. v. County of Yuba* (2002) 101 Cal.App.4th 278, 291; see also *Heyman v. Franchise Mortgage Acceptance Corp.* (2003) 107 Cal.App.4th 921, 925, fn. 1.)

4

At the beginning of trial, the parties stipulated the primary legal issue to be determined was the interpretation of paragraph 3.1 of the leases regarding what future rent was owed upon early termination of the leases. Martin argued Harold was required to pay rent during the 120-day notice period, and then upon expiration of the notice period (i.e., termination of the lease) had to also pay an amount equal to another four months of rent, i.e., eight months total for potential future rent from the time notice of termination was given. Harold argued paragraph 3.1 established four months' rent as the maximum he would have to pay upon giving notice he was terminating the lease. Harold argued if he had to pay rent during the 120-day notice period and then also pay an amount equal to another four months' rent, the latter would constitute an illegal penalty or liquidated damages provision.

The trial court apparently agreed with Harold's position. It explained: "A clear understanding of [paragraph 3.1] . . . is that [provision] allows for termination of the lease by giving 120-days notice, and upon such early termination, meaning of the notice period, that the lessee was to pay to less[or] a lump sum amount equal to four months of rent, so I think that the four months of rent is tied into the notice period of early termination of the 120 days. I do not believe that it's disjunctive and would act as a liquidated damage clause or a penalty, but it fails 1546 of the Civil Code[3] in that regard. That's my ruling." Before beginning presentation of evidence and argument, Martin's counsel confirmed his understanding of the court's interpretation of paragraph 3.1 was that he could only recover a maximum of four months of rent as future rent damages.

---

[3]     As there is no section 1546 of the Civil Code, we assume the trial court meant section 1671 of the Civil Code, the provision that addresses the validity of liquidated damages provisions. All further statutory references are to the Civil Code, unless otherwise indicated.

5

*The 515 Building Evidence and Argument*

The following evidence/argument was presented to the trial court as to the 515 Building. Harold gave written notice to Martin on October 30, 2007, he was terminating the lease on the 515 Building as of the end of November 2007. He did not vacate the premises until December 20, 2007. On December 29, 2007, Martin signed a one-year lease with new tenants for the 515 Building at a monthly rent of $4,250 ($592.50 more than Harold's rent) and the new tenant took possession on January 1, 2008. (The joint exhibit list indicates there was another lease provided to the trial court for the 515 Building to a tenant named "Stellar," but that lease has not been provided to us.)

The record contains copies of checks (most of which were a few days late) from Harold to Martin for payment of rent on the 515 Building as follows: $3,657.50 for the months of January, February and March 2007; $4,754.75 (rent and late fees) for April 2007; and $3,657.50 for the months of May, June, July, and August 2007. Although the record does not contain checks for September or October 2007, Martin's payment schedule provided to the trial court represented Harold timely paid rent for both those months.

The clerk's transcript contains two different schedules prepared by Martin of the amounts he claimed Harold owed on the 515 Building. One was attached to Harold's trial brief, but it is not clear if it was actually an exhibit admitted at trial—it does not appear on the parties' joint exhibit list. It showed no rent paid by Harold for November or December 2007, but that Martin credited Harold's security deposit to the rent due for November 2007. This schedule showed late charges Martin assessed Harold for several months in 2007, although those late charges are not at issue on this appeal.

Martin's trial brief contained a different schedule by which he calculated what Harold owed him on the 515 Building. Martin claimed that as of October 2007, Harold would have owed $2,091.13 in late charges and interest on late rent. When

Harold gave notice in October he was terminating the lease, he became obligated to pay Martin for four more months of rent (a total of $14,739.73) because the lease required 120 days notice before it terminated. Martin then credited Harold for his security deposit (applying it to November rent), which brought the total to $14,400. Martin then added 10 percent annual interest through trial, to bring the claimed total to $20,640.

*The 519 Building Evidence and Argument*

Various documents relating to the unlawful detainer proceeding on the 519 Building were before the trial court and we detail them first. Martin served a three-day notice to perform covenant or quit on Harold on December 17, 2007, which stated Harold owed $1,828.75 in late fees under the lease for the months of August through December 2007, and declaring the lease forfeit.

The unlawful detainer action was filed on January 20, 2008. In its April 23, 2008, statement of decision in the unlawful detainer action, the court found Harold violated the lease by habitually making late rent payments and not paying the late charges and the lease was forfeited. It found Martin was entitled to judgment for late fees for August 2007 through November 2007—a total of $1,463. The court found Harold had paid December 2007 rent and it "[could not] award additional sums for unpaid rent following December of 2007, if any, as the evidence presented simply failed to establish what if anything more was owed by Harold." The court declined to award any damages for a malicious holdover. The court found Martin was also "entitled to $139.73 per day in daily damages from the date of entry of judgment."

The judgment in the unlawful detainer proceeding was entered May 7, 2008. It gave Martin possession of the premises and awarded him $1,463 for late fees. The judgment stated, "Although [Harold] may in the future become liable for daily damages, alleged in the complaint to be $139.73 per day, such future damages are not property included in this judgment . . . ." Martin regained possession of the 519 Building on May 29, 2008.

7

The clerk's transcript contains checks for Harold's payment of rent on the 519 Building as follows: $3,657.50 for the months of January, February, and March 2007; $4,753.75 (rent and late fees) for April 2007; $3,657.50 for the months of May, June, July, and August 2007; $3,657.50 for the months of November and December 2007; and $3,657.50 for the months of January, February, and March 2008. Although the record does not contain a check for April 2008, Martin's payment schedule presented to the court represents that Harold timely paid rent for that month and Martin applied Harold's security deposit to the May 2008 rent. Although the parties' joint exhibit list indicates the 519 Building was subsequently re-let, the documents pertaining to the new lease are not before us, and thus, we do not know when and for how much. Martin's counsel represented the new lease was obtained eight months after he regained possession.

*Judgment*

The trial court entered a judgment awarding Martin damages of $4,939.56 relating to the 515 Building lease and no damages as to the 519 Building lease. It declined to award Martin any damages on his cause of action seeking attorney fees for the unlawful detainer action because he did not present any evidence on that cause of action.

A statement of decision was not requested, however, the trial court made comments on the record explaining its ruling. As to the 515 Building lease, the court concluded when Harold gave notice at the end of October 2007, he was terminating the lease he would have owed Martin for four more months rent pursuant to paragraph 3.1. Martin re-let the premises effective January 1, 2008, so Harold only owed for November and December 2007, plus late fees and interest. The court explained Harold owed Martin a total of $8,597.55, less the security deposit of $3,657.50, for a total of $4,939.56. As to the 519 Building, the court commented Harold had paid all rents due for January, February, March, and April 2008. The security deposit was used for May 2008 rent.

8

Possession of the premises was returned to Martin on May 29, 2008, so no further rental damages would be ordered.

DISCUSSION

1. *Standard of Review*

"[I]t is settled that [on appeal]: 'A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' [Citations.]" (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) Therefore, an appellant has an affirmative duty on appeal to overcome the presumption of correctness and demonstrate prejudicial error. (*Hearn v. Howard* (2009) 177 Cal.App.4th 1193, 1207.)

Questions of law, such as the proper interpretation of a contract when it does not turn on the credibility of extrinsic evidence, are reviewed de novo (*City of Manhattan Beach v. Superior Court* (1996) 13 Cal.4th 232, 238), but if a party does not request a statement of decision, the appellate court will imply all necessary factual findings to support the judgment. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133-1134.) Here, because no statement of decision was requested, we "imply all findings necessary to support the judgment, and our review is limited to whether there is substantial evidence in the record to support these implied findings." (*In re Marriage of Cohn* (1998) 65 Cal.App.4th 923, 928.)

2. *The 519 Building*

Martin contends the trial court improperly applied res judicata/collateral estoppel principles to conclude the unlawful detainer action resolved *all* rent damage issues as to the 519 Building lease and, thus, it erred by failing to award him the early termination fee provided for under paragraph 3.1 of the lease. We reject his contentions.

9

Before addressing what we discern Martin's argument to be, we address what it cannot be. Martin's argument is couched in terms of attacking the trial court's failure to award him the early termination fee (equal to four months' rent) provided for in paragraph 3.1. But by its terms, the provision has no applicability to the 519 Building lease for the simple reason Harold did not elect to terminate the 519 Building lease early. It was Martin who terminated the 519 Building lease by evicting Harold for nonpayment of approximately $1,400 in late fees. Thus, Martin was not entitled to payment of an early termination fee under Paragraph 3.1 as to the 519 Building. We turn then to Martin's argument the trial court improperly concluded principles of res judicata and collateral estoppel precluded Martin's recovery of "future rents" for the 519 Building.

"'"'The doctrine of *res judicata* gives certain *conclusive effect* to a *former judgment* in subsequent litigation involving the same controversy." [Citation.] The doctrine "has a double aspect." [Citation.] "In its primary aspect," commonly known as claim preclusion, it "operates as a bar to the maintenance of a second suit between the same parties on the same cause of action. [Citation.]" [Citation.] "In its secondary aspect," commonly known as collateral estoppel, "[t]he prior judgment . . . 'operates'" in "a second suit . . . based on a different cause of action . . . 'as an estoppel or conclusive adjudication as to such issues in the second action as were actually litigated and determined in the first action.' [Citation.]" [Citation.] "The prerequisite elements for applying the doctrine to either an entire cause of action or one or more issues are the same: (1) A claim or issue raised in the present action is identical to a claim or issue litigated in a prior proceeding; (2) the prior proceeding resulted in a final judgment on the merits; and (3) the party against whom the doctrine is being asserted was a party or in privity with a party to the prior proceeding. [Citations.]"' [Citation.]" (*Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788, 797.) In this context, the phrase "cause of action" means "the right to obtain redress for a harm suffered, regardless of the specific

10

remedy sought or the legal theory (common law or statutory) advanced. [Citation.]" (*Id.* at p. 798.)

The res judicata effect of an unlawful detainer proceeding is narrow, but substantial. "Generally speaking, an unlawful detainer judgment has limited res judicata force because it typically follows a summary proceeding focused only on deciding a party's right to immediate possession of property." (*Gombiner v. Swartz* (2008) 167 Cal.App.4th 1365, 1371.) "But when litigants to an unlawful detainer proceeding fully try other issues besides the right of possession, the unlawful detainer judgment is conclusive as to those other litigated issues. [Citations.]" (*Ibid.*)

Martin is correct the unlawful detainer judgment does not preclude an award of damages that was not adjudicated therein. "In the unlawful detainer action, the statute prescribes the exclusive measure of damages. The landlord can only recover damages in the unlawful detainer proceeding incidental to the recovery of possession. His or her recovery is limited to the past due rent and damages for the value of possession after termination of the lease and prior to judgment in the unlawful detainer action." (7 Miller & Starr, Cal. Real Estate (3d ed. 2012) § 19:208, fns. omitted.) In the unlawful detainer action, Martin was only entitled to recover the delinquent rent due on the effective date of the three-day notice to quit (in this case the unpaid late fees as of December 17, 2007), and any post-notice, *prejudgment* damages, i.e., the reasonable rental value of the property during the time Harold "wrongfully" occupied the property after failing to surrender possession. (*Ibid.*; see also § 3334, subd. (b)(2); Code Civ. Proc., § 1174.) Any claims Martin had for damages accruing *after* entry of the unlawful detainer judgment, and prior to his regaining possession of the property, and for "future rent damages," i.e., damages for the remainder of the lease term after regaining possession, were only recoverable in a separate action for damages brought under section 1951.2. (7 Miller & Starr, Cal. Real Estate, *supra,* § 19:209, fns. omitted; see

11

also Code Civ. Proc., § 1174.5 [unlawful detainer judgment does not bar subsequent action for damages under section 1951.2].)

Martin served a three-day notice to perform covenant or quit on Harold on December 17, 2007, and filed his unlawful detainer action on January 20, 2008. The unlawful detainer complaint is not part of the record on this appeal. Accordingly, we have no record as to the damages Martin sought to adjudicate. But the court in the unlawful detainer action determined Harold owed Martin $1,463 in late fees for August 2007 through November 2007. As for Martin's post-notice, *prejudgment* damages, the court in the unlawful detainer action concluded Harold paid the December 2007 rent, and Martin failed to introduce any evidence as to any additional amounts Harold owed, i.e., the reasonable rental value of the premises from January 2008 until the unlawful detainer judgment was entered on May 7, 2008. Moreover, to the extent Martin argues the unlawful detainer action did not adjudicate those post-notice, *prejudgment* damages, the trial court *in this case* noted (and the evidence in this record demonstrates) Harold in fact paid rent for January, February, March, and April 2008, and Martin retained Harold's security deposit which covered the rent for May 2008 (thus, also covering the rental value from the entry of judgment on May 7, until Martin regained possession on May 29, 2008). In short, the record supports the implied findings by the trial court in this case that all rent claims due up until the time Martin regained possession were resolved.

Martin argues he was also entitled to prospective damages for the unpaid rent for the remainder of the original lease term—an amount he asserts would be equal to the early termination fee specified in paragraph 3.1, i.e., four months rent. (As we already have noted above, Martin was not entitled to an early termination fee, because Harold did not terminate the lease—Martin did.)

A lessor may only recover damages for the balance of a lease term in accordance with section 1951.2, subject to his duty to mitigate those damages. Under that section, "Subject to certain limitations, as additional damages caused by the tenant's

12

breach of the lease, the landlord may recover the amount by which the unpaid rent for the balance of the lease term that accrues after the time of the award exceeds the amount of rent loss the tenant proves could reasonably have been avoided by the landlord, discounted at the discount rate of the Federal Reserve Bank of San Francisco at the time of the award, plus 1%." (7 Miller & Starr, Cal. Real Estate, *supra,* § 19:209, fns. omitted; see § 1951.2, subds. (a) & (b).)

A lessor cannot recover the excess of the unpaid rent for the balance of the term unless: "(1) The lease provides that the damages [the lessor] may recover include the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award, or for any shorter period of time specified in the lease, exceeds the amount of such rental loss for the same period that the lessee proves could be reasonably avoided; or [¶] (2) The lessor relet the property prior to the time of award and proves that in reletting the property he acted reasonably and in a good-faith effort to mitigate the damages, but the recovery of damages under this paragraph is subject to any limitations specified in the lease." (§ 1951.2, subd. (c)(1) & (2).)

Martin has made no argument, let alone any showing, he satisfied the requirements of section 1951.2. Indeed, he does not mention the statute. Because there is no statement of decision, we must imply findings by the trial court that the requisites for recovery of future rents for remainder of the lease term were not met. Martin has not demonstrated any error by the trial court in declining to award damages for the remainder of the rent term.

*3. The 515 Building*

Martin also challenges the damage award as to the 515 Building lease. Martin's argument is not entirely clear, but the bottom line is he believes he should have been awarded four months' rent attributable to the 120-day notice period from the time Harold notified him he was terminating the lease—offset by the rent he received upon re-

letting the premises two months into the 120-day notice period—plus the lump sum payment provided for in paragraph 3.1 of the lease. We reject Martin's contention.

Although not clearly articulated in his brief, the gist of Martin's argument appears to be the trial court incorrectly interpreted paragraph 3.1. Before trial, the court appeared to interpret paragraph 3.1 as establishing four months' rent as the maximum Harold would have to pay Martin in the event the lease was terminated early. Martin does not discuss any law concerning contract interpretation. We apply a de novo standard of review. (*Morgan v. City of Los Angeles Bd. of Pension Comrs.* (2000) 85 Cal.App.4th 836, 843.)

"A lease agreement is subject to the general rules governing the interpretation of contracts. [Citation.] 'A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.' [Citation.] When possible, the parties' mutual intention is to be determined solely from the language of the lease. 'The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," . . . controls judicial interpretation.' [Citation.] 'Interpretation of a contract "must be fair and reasonable, not leading to absurd conclusions. [Citation.]"' [Citation.]" (*Bill Signs Trucking, LLC v. Signs Family Limited Partnership* (2007) 157 Cal.App.4th 1515, 1521.)

We generally agree with Martin as to the interpretation of paragraph 3.1. The provision must be read in full: "While the Lessee is in bankruptcy, Lessee . . . may terminate this Lease for any reason whatsoever, after providing thirty (30) days written notice to Lessor. If this Lease is terminated by Lessee during its bankruptcy, the maximum claim that Lessor may have against Lessee for early termination shall be four (4) months of rent. After Lessee's bankruptcy, Lessee may terminate this Lease for any reason by providing at least 120 days written notice, and upon such early termination, Lessee shall pay to Lessor a lump sum amount equal to four (4) months of rent."

14

A plain reading of paragraph 3.1 envisions two early termination circumstances. The first (encompassed by the first two sentences) was if the lessee (originally Pemma) was still in bankruptcy, the lease could be terminated on 30 days written notice and the maximum damages the lessor (originally HMS) could recover would be "four (4) months of rent." The second circumstance, which the parties agree is the one applicable here, was that *after* the bankruptcy the lessee (now Harold) could terminate the lease by giving 120 days notice to the lessor (now Martin), and upon the *termination* of the lease, paying "a lump sum amount equal to four (4) months of rent." Because the lease would not have *terminated* until expiration of the 120-day notice period (see, e.g., *Highland Plastics, Inc. v. Enders* (1980) 109 Cal.App.3d Supp. 1, 8 ["[t]he tenancy is not terminated on the giving of the notice but on expiration of the notice period"]), paragraph 3.1 envisions payment of rent during the notice period (while the lease remained in effect) and then payment of a lump sum upon the termination of the lease at the conclusion of the notice period.

But we disagree with Martin his subsequent re-letting of the premises had no bearing on whether Harold was obligated to make the paragraph 3.1 payment. Harold gave notice on October 30, 2007, he was terminating the lease. Although Harold purported to give 30 days' notice, the lease would not have terminated until expiration of the 120-day period in February 2008. Martin re-let the property effective January 1, 2008, at a significantly higher rent, before the expiration of Harold's lease and before any early termination payment accrued. "'It has long been the settled law of this state, that while re-entry by the landlord and his resumption of the benefits, use and enjoyment of the premises terminates the lease, so far as the landlord's right to rentals subsequent to such entry is concerned, this does not affect the tenant's liability for rent accrued prior to such re-entry.' [Citations.]" (*Space Properties, Inc. v. Tool Research Co.* (1962) 203 Cal.App.2d 819, 826.) *Gould v. Corinthian Colleges, Inc.* (2011) 192 Cal.App.4th 1176, the sole authority Martin cites in support of his argument, does not aid him.

15

Although *Gould* observed a lease's early termination payment provision was not "rent" but rather "payment[] for the exercise of a right or privilege" of terminating the lease early (*Id.* at p. 1180), it did not involve a circumstance like we have here—where the premises was re-let prior to expiration of the termination period. In sum, the trial court did not err by concluding Harold was liable only for the unpaid rent prior to re-letting the premises.

## DISPOSITION

The judgment is affirmed. In the interests of justice, each side shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)


O'LEARY, P. J.

WE CONCUR:


RYLAARSDAM, J.


BEDSWORTH, J.